**The STATE of Ohio, Appellee,**

**v.**

**BLAIR, Appellant.**

[Cite as *State v. Blair* (1990), 70 Ohio App.3d 774.]

Court of Appeals of Ohio,
Clark County.

No. 2659.

Decided Dec. 24, 1990.

*David E. Smith,* Assistant Prosecuting Attorney, for appellee.
*James A. Doughty,* for appellant.

WOLFF, Presiding Judge.

Jeffrey Blair was convicted of murder and abuse of a corpse, for which he was sentenced to consecutive terms of imprisonment of fifteen years to life and three to five years, respectively. Blair asserts eleven assignments of error on appeal, most of which involve evidentiary questions, including the novel issue of the admissibility of DNA testing.

We affirm.

At approximately 2:30 a.m. on November 12, 1988, Mike Pestke and Bill McConnell accompanied Blair to the Cedar Pub in Urbana. Both Pestke and McConnell testified that they went to the bar after it had closed in order to purchase and consume cocaine.

Upon leaving the bar half an hour later, Blair saw his brother's ex-girlfriend, Bridget Buxton, driving by, and flagged her down. Buxton agreed to follow the three men to McConnell's house. After a short time at the house, Blair told the other two men that he was going to try to supply some cocaine to Buxton, and left with her in her car at 3:30 a.m. McConnell and Pestke remained in the house and continued to consume cocaine.

Pestke testified that he next saw Blair at 10:30 a.m. the same morning. Blair told Pestke that Buxton had been murdered, and asked if Pestke would provide him with an alibi. Blair allegedly said that Buxton had driven him to a bridge where they met a man, whom he did not know, who identified himself as Buxton's boyfriend. The boyfriend consumed some cocaine, got into a fight with Buxton, and then began bashing her head against the pavement until she died. Blair allegedly admitted that he had helped the boyfriend throw Buxton's body into the river, giving rise to the charge of abusing a corpse. Pestke testified that Blair said that the boyfriend then left, vowing never to return.

After securing his alibi, Blair went away but returned that same night to inform Pestke that he had disposed of the evidence at the crime scene.

On the following morning, two fishermen discovered Buxton's battered body floating in Mad River. The coroner determined the cause of death to be strangulation and a skull fracture. A vaginal smear detected the presence of semen, but there was no sign of forced intercourse. Buxton's car was found nearby with its doors and seats stained with blood and semen. Blood was also discovered on the guardrail of the bridge near which Buxton's car was discovered.

The trial court ordered Blair to supply the state with samples of his blood, hair, and saliva. These samples were sent to Cellmark Diagnostics, Inc., which performed "length polymorphism" tests upon the DNA found in the sperm taken from the corpse and car seat. These tests determined that the sperm had come from Blair.

The state dismissed two charges of drug abuse prior to trial. The trial court directed a judgment of acquittal on the charge of tampering with evidence. The jury returned a verdict of guilty on the charges of murder and abuse of a corpse.

As his first assignment of error, Blair asserts that:

"The trial court erred when it admitted, over objection, testimony concerning cocaine use by Mr. Blair on the night in question in violation of Evidence Rule 402 and the Fifth and Fourteenth Amendments to the United States Constitution."

The thrust of the argument in support of this assignment of error is that the matter of defendant's cocaine use on the night in question was irrelevant due to the dismissal of the drug abuse counts. Even assuming some marginal relevance, Blair argues, the prejudicial effect of the evidence outweighed the slight probative value. We do not agree.

The defendant moved the trial court for an order "prohibiting the witness, Michael F. Pestke, from using the word 'cocaine' during his testimony." The gist of the argument in support of this motion in the trial court was that it would be inflammatory and prejudicial to permit Pestke to testify that the substance that he and Blair were utilizing on the night in question was cocaine in the absence of scientific testing to establish its exact nature. The trial court overruled the motion prior to trial.

During its opening argument, the state intimated that cocaine "possibly" played a role in the death of Bridget Buxton. Counsel for the defendant objected to the use of the word "possibly." After a bench conference, the prosecution continued its opening statement and said that "we expect the evidence to show that the defendant * * * [was] using cocaine." Defense counsel again objected, but was overruled. However, during the remainder of the trial, no objections were interposed to any witnesses mentioning either his own use or Blair's use of cocaine, or statements as to cocaine, on the night in question.

In that Blair did not advance objections as to relevance in the trial court, he has not preserved error based on this consideration. He has further waived any error for purposes of appellate review by not having objected to the testimony of the state's witnesses, *at the time it was elicited,* as it related to their own use of cocaine or to Blair's use of cocaine, possession of cocaine, or statements as to cocaine. *State v. Brown* (1988), 38 Ohio St.3d 305, 528 N.E.2d 523, paragraph three of the syllabus. Furthermore, given the fact that the immediate background and aftermath of the offense involved Blair's use of, possession of, and attempts to obtain and sell cocaine, it would have been indeed difficult to insulate the jury from any mention of cocaine. See *State v. Wilkinson* (1980), 64 Ohio St.2d 308, 18 O.O.3d 482, 415 N.E.2d 261, paragraph two of the syllabus.

We also reject Blair's argument that the prejudicial effect of mentioning cocaine substantially outweighed its probative value, thus rendering the

testimony inadmissible under Evid.R. 403(A). The Supreme Court has interpreted this rule to mean that a " 'trial court has broad discretion in the admissibility * * * of evidence, and unless it has clearly abused its discretion and the defendant has been materially prejudiced thereby, this court should be slow to interfere.' " *State v. Maurer* (1984), 15 Ohio St.3d 239, 265, 15 OBR 379, 401, 473 N.E.2d 768, 791, quoting *State v. Hymore* (1967), 9 Ohio St.2d 122, 128, 38 O.O.2d 298, 302, 224 N.E.2d 126, 130. We cannot say from the record before us that the trial court acted unreasonably, arbitrarily, or capriciously in weighing the testimony's potential prejudice against its probative value. Therefore, Blair's first assignment of error is overruled.

■ Blair asserts as his second assignment of error that:

"The trial court erred when it refused to grant a mistrial after the state's witness testified that Mr. Blair had previously been in jail, said error violated Mr. Blair's rights as guaranteed by the Ohio Evidence Rules 404 and 609 and the Fifth and Fourteenth Amendments to the United States Constitution."

We do not agree.

Blair moved to preclude witness Pestke from using the word "penitentiary." This motion was based upon the fact that Pestke had given Sgt. Sullivan of the sheriff's office a statement that said, in part, that he had known the defendant "from years back, before he went to the penitentiary." By pretrial order, the court ordered that "the motion taken literally is not well taken[;] however, the prosecutor is directed to refrain from asking questions in such a way that a truthful answer would reveal that the defendant was incarcerated in a penitentiary." During his direct examination at trial, Pestke was asked to describe his relationship with Blair. He stated that he had known Blair for about five years and that "we really become [*sic*] better friends when he got out of jail." At that juncture, Blair moved for a mistrial, but was overruled. The trial court instructed the jury at that time, "Ladies and gentlemen, disregard the answer of that last question. It was not responsive. It was improper. You may not consider it for any purpose." We have searched in vain for testimony by Pestke that he and Blair had been cellmates, as suggested in Blair's reply brief. Although Pestke testified on cross-examination that he had received his GED at the Lebanon Correctional Institution, we find nothing in the testimony of Pestke to suggest that Blair had also been incarcerated at Lebanon.

■ Whether to grant a mistrial is within the sound discretion of the trial court. See *State v. Stout* (1987), 42 Ohio App.3d 38, 536 N.E.2d 42. At the time the mistrial was requested, the jury had heard only that Blair had been in jail. The jury was immediately instructed to disregard that information, and

we have no reason to presume that it did not do so. See *State v. Ferguson* (1983), 5 Ohio St.3d 160, 163, 5 OBR 380, 383, 450 N.E.2d 265, 268. The second assignment of error is overruled.

■ As his third assignment of error, Blair contends that:

"The trial court erred when it admitted, over objection, voluminous testimony concerning the victim's background and her family's bereavement upon learning of her death in violation of Ohio Evidence Rule 404 and the Fifth and Fourteenth Amendments to the United States Constitution."

During the presentation of the state's case-in-chief, the victim's father, Richard Buxton, was asked a number of questions about his daughter. These questions continued for seven pages of transcript without an objection from Blair. The witness then testified as follows:

"Q. Now, Mr. Buxton, when did you leave for Florida during the month of November, 1988?

"A. Friday morning the 11th.

"Q. And for what reason were you going to Florida?

"A. I'm a U.S.T.A. Director—which is the United States Trotting Association, and I'm the director from District 1 which is the State of Ohio, and I'm chairman of the driver's committee of the whole United States and Canada.

"Q. How long were you planning to be in Florida?

"A. That one week. We were going to be in Ft. Lauderdale through Tuesday, and we were going to drive to Orlando to visit an older couple that's been my owners for the past 15 years. We were going to stay with them a couple of days.

"Q. What particular town or city was it in Florida you were going to?

"MR. DOUGHTY: Your Honor, I'm going to object at this time. I don't see the relevancy of this examination *at this point.*

"THE COURT: Overruled." (Emphasis added.)

The state then resumed asking questions. No objection was made to this testimony. From this record we can only conclude that Blair's objection was limited to the relevancy of a detailed account of the parents' itinerary while in Florida.

On appeal, Blair claims error in the admission of Buxton's testimony because it tended to humanize the victim and invoke the passion and prejudice of the jury. By not objecting to those questions when they were asked of Buxton, Blair has simply failed to preserve any alleged error for purposes of appellate review. His claim that "any further objection would have been

useless" is utter speculation in light of the fact that his first objection was clearly unrelated to the issue that he now raises.

We also disagree with Blair's characterization of the bereavement testimony as being "voluminous." Relatively little of Buxton's testimony was spent "humanizing" his daughter. The record does not indicate any calculated effort by the prosecutor to unfairly evoke the sympathy of the jury. We see no possible prejudice to Blair from a few innocuous comments on the victim's background.

As his fourth assignment of error, Blair asserts that:

"The trial court erred when it continued the trial twice for a total of one-hundred-eleven (111) days from May 23, 1989, to September 11, 1989, at the request of the state of Ohio. The continuance constituted an abuse of discretion and denied Mr. Blair his right to a speedy trial as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution, Article 1, Section 10 of the Ohio Constitution and Ohio Revised Code Section 2945.71, et seq."

This case was originally scheduled for trial on February 9, 1989. On January 30, 1989, the defendant moved for a continuance, stating that he was provided with discovery material on January 26, 1989, and could not adequately prepare for trial in the remaining time.

On January 31, 1989, Blair appeared with his counsel before the trial court and expressly waived his right to be brought to trial within the time period specified by Ohio law. In accordance therewith, and with the motion for continuance of the defendant, the court continued the trial date to May 23, 1989. The court subsequently continued the matter for trial first to August 14, 1989, and thereafter to September 11, 1989. Both continuances were over the verbal objection of counsel for the defendant. The state contends that Blair's January 31, 1989 waiver of his statutory right to a speedy trial, together with his failure to file a "formal written objection and demand for trial" precludes him from asserting error on appeal as to the two periods of continuance granted over his verbal objection. See *State v. O'Brien* (1987), 34 Ohio St.3d 7, 516 N.E.2d 218, paragraph two of the syllabus.

Although we overrule this assignment of error, we do not do so on the basis of the narrow distinction between a verbal and written objection to a further continuance.

Blair concedes, as he must, that whether to grant a continuance is commended to the sound discretion of the trial court, and such determinations may only be the basis of reversal if they amount to an abuse of discretion.

See *State v. Unger* (1981), 67 Ohio St.2d 65, 67, 21 O.O.3d 41, 43, 423 N.E.2d 1078, 1080.

▊ In its entry granting a continuance from May 23 to August 14, 1989, the court stated as follows:

"This matter came before the court on May 16, 1989 on the State's motion for a continuance of ten weeks by reason of newly discovered evidence.

"Defendant objected to the granting of the motion.

"The court finds that the defendant in open court on March 9, 1989 waived the time requirements for the trial of a criminal case as set forth in O.R.C. Section 2945.71 et seq.

"The State's reason for the request was evidence discovered as late as the week of May 8, 1989 which requires scientific (DNA) analysis which may not be available for ten to twelve weeks.

"The court finds that the case must be tried within a reasonable time even though the requirements of Section 2945.71 have been waived.

"The court finds that the request by the State is reasonable and such a delay will not deprive the defendant of his right to a fair trial by reason of the length of the delay."

The factual recitation in the entry finds support in the record. The newly discovered evidence consisted of semen stains found on the car seat covers of the victim's automobile. DNA analysis of these semen stains might have worked to the benefit, instead of to the detriment, of the defendant. While the semen stains might have been discovered earlier during the investigation of this homicide, we do not think that the state should have necessarily been precluded from subjecting those stains to DNA analysis because of the lateness of their discovery. We find no abuse of discretion in the trial court's granting of a continuance from May 23 to August 14, 1989.

Cellmark Diagnostics, Inc. ("Cellmark") was only able to provide the state with a preliminary report within this continuance. The state moved for another continuance on July 26, 1989. At the hearing on this motion, held August 9, 1989, the trial court heard expert testimony that this preliminary report was insufficient to prove a match between the semen stains and Blair's blood. The trial court overruled the motion. However, on August 14, 1989, the scheduled day of the trial, the state again requested a continuance, which the court granted. By the time of the trial, Cellmark had completed its final report.

▊ In granting the continuance from August 14 to September 11, the trial court stated in its entry as follows:

"This matter came before the court on August 14, 1989 on motion of the State for a continuance of the trial on Counts one, two, three and four to begin August 14, 1989 to a later date.

"The trial was set to begin at 9:00 A.M. August 14, 1989. The motion for the continuance was filed at 8:20 A.M. August 14, 1989. The reason for the requested continuance was that the lead trial counsel for the State was unable to appear August 14, 1989 for trial due to being scheduled to enter the hospital as a result of the physical condition of his back. The State also stated that, due to the technical nature of some of the evidence known only to the lead counsel, there was no prosecutor prepared to proceed on such evidence. The request was for two or three weeks so that the lead counsel may be able to proceed to trial or in the alternative, so that another prosecutor might properly prepare the case for trial.

"The defendant objected to the continuance.

"The court finds that the defendant at an earlier date has waived his right to a speedy trial.

"The court further finds that a four week continuance is a reasonable period for a continuance under the circumstances before the court and further finds that such time is a sufficient time for another prosecutor to undertake the trial procedure in the event that the present lead counsel continues to be incapacitated."

This continuance was granted on the basis of representations made by the Clark County Prosecutor, Stephen Schumaker. In open court on August 14, 1989, at 9:05 a.m., Schumaker represented that the previous evening, he was notified by lead counsel for the state, David Smith, that he had injured his back, would be entering the hospital on August 14, 1989, for treatment, and that Smith had been informed that he would be unable to appear. He requested a continuance of two to three weeks "to permit * * * [Mr. Smith] to recover or, in the alternative, that other counsel might be assigned that would be adequately prepared to proceed in this matter. * * * [T]here's a number of technical areas in this case including some DNA evidence that was prepared to go forward on that co-counsel was not prepared to go forward on; and for that reason the State would request a continuance of rather short duration."

On appeal, Blair contends that this August 14, 1989 motion for continuance was a contrivance because Smith conceded during a chambers conference in September, prior to the commencement of the trial, that his cocounsel, Darnell Carter, was able to try the case by himself.

An examination of Smith's representations to the court on September 11, 1989, belies the assertion on appeal that the motion for continuance of August 14, 1989, was a contrivance.

"So as far as my participation in the trial or the continuance, I mean, if the trial was going to go on the 14th, I was certainly not going to be a part of it, and the decision to continue the case was left up to either continue the case or to try the case without me was left up to Mr. Carter and Mr. Schumaker. Mr. Carter wanted to go ahead and try the case on the 14th. Mr. Schumaker did not want to do that. He's the County Prosecutor. In this particular instance as in most instances his opinion carried the most weight so we asked for a continuance for that reason.

"* * *

"So the request for the continuance was not done on a—as some dilatory tactic to—because the State was not prepared to try the case. We were, in fact, prepared to try the case. Mr. Carter wanted to try the case. However, he was overruled by Mr. Schumaker in that regard due to the fact that I had—I was of the ones who was working with the Cellmark people and had prepared that aspect of the case."

It was apparently the judgment of the Clark County Prosecutor that Carter was not capable of presenting the state's case by himself on August 14, 1989. Smith's statements do not detract from this opinion, but merely indicate that Carter, himself, was willing to try the case unassisted regardless of Schumaker's assessment of his ability to do so. In any event, what was presented to the trial court on August 14, 1989, was the representation of Schumaker that the state of Ohio was not in a position to proceed due to the eleventh-hour disability of the lead prosecutor. We find no abuse of discretion in the court's granting the continuance from August 14 to September 11 and the fourth assignment of error is overruled.

Blair's fifth assignment of error contends that:

"The trial court erred when it ordered Mr. Blair to submit to a blood test in violation of Mr. Blair's right as guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution and Article 1, Section 14, of the Ohio Constitution."

Citing *Schmerber v. California* (1966), 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908, Blair contends that the order requiring him to submit to the withdrawal of his blood violated his constitutional rights in that there was no showing prior to the issuance of the order of "probable cause that the blood will, in fact, lead to inculpatory evidence." *Id.* at 769–771, 86 S.Ct. at 1835–1836, 16 L.Ed.2d at 918–920.

On May 12, 1989, the state moved the court for an order that blood, hair, and saliva samples be taken from Blair to permit analysis with hair, blood, and a cigarette butt with saliva stains, that had recently been found in the victim's automobile. The state conceded that the blood probably came from the victim.

The trial court conducted a hearing on the motion May 15, 1989, wherein Blair's sole objection to the motion was based on the lateness of the request. Indeed, in response to a specific inquiry by the court, counsel for Blair expressly disclaimed any basis for objecting to taking the defendant's blood, hair, and saliva samples other than the lateness of the motion.

"THE COURT: Are you claiming otherwise that you[1] don't have authority to take somebody's blood?

"MR. DOUGHTY: No, Your Honor, I'm not taking that position.

"THE COURT: Or cut his hair?

"MR. DOUGHTY: No.

"THE COURT: Or have him spit on something?

"MR. DOUGHTY: I'm not taking that position. I'll defer that to the Court.

"THE COURT: The question you're raising is that the lateness and—

"MR. DOUGHTY: Yes, right.

"THE COURT:—close to trial and the possibility of changing your—

"MR. DOUGHTY: Exactly."

Under these circumstances, we are constrained to conclude that any error predicated on a violation of Blair's constitutional rights has been waived for the purposes of appellate review.

However, we find that even if Blair had not waived this right, the intrusion was permissible under *Schmerber*. Blair concedes that probable cause sufficient under *Schmerber* would have existed for the drawing of blood if the state of Ohio intended at the time of the request to subject the samples to DNA testing. Blair contends that the decision to perform DNA tests was not made until after the order was issued. We disagree. The representations of counsel on the morning of May 15, 1989, prior to the order's issuance, indicate that DNA testing of the semen sample was certainly a possibility. Moreover, the fact that the state conceded that the blood stains found in the victim's car probably were those of the victim would not have undercut the probable cause

---

**1.** The trial court's use of the word "you" is somewhat problematic. Clearly, the court could not have been referring to the person whom he seems to be addressing, Mr. Doughty. Mr. Doughty was Blair's attorney, and Blair obviously had authority to draw his own blood. From the context in which it appears in the record, the only reasonable interpretation is that when the trial court said "you," it meant the state.

that Blair's blood would lead to inculpatory evidence because they also discovered semen stains in the car, which were obviously not those of the victim. Therefore, the order did not violate Blair's Fourth Amendment rights. The fifth assignment of error will be overruled.

In his sixth assignment of error, Blair asserts that:

"The trial court erred by admitting the results of the DNA test because the state of Ohio failed to lay the proper foundation for the admission of the test results."

Blair advances four arguments in support of this contention. We find none of them to be persuasive.

Blair's first argument is that his blood sample, and more important the DNA test results, which were the fruits of this sample, were inadmissible because it was drawn in violation of his Fourth Amendment rights. Since we found under the fifth assignment of error that Blair's constitutional rights were not abridged by the order to provide a blood sample, this argument necessarily fails.

Blair's second argument is that the DNA test results were inadmissible because the blood sample upon which they were based, State's Exhibit 45, was never identified as having come from Blair, nor was a proper chain of custody established. We do not agree.

Timothy Shepherd, a forensic chemist for the Springfield Regional Crime Laboratory, identified the blood sample.

"Q. Mr. Shepherd, you've handed me what's now been marked as State's Exhibit 45. Something you removed from the box; is that correct?

"A. That is correct.

"Q. Are you familiar with that, what appears to be a tube of blood?

"A. State's Exhibit 45 is a tube of blood that was removed from the Defendant, Jeffrey Blair, on the 15th of May, 1989, at 3:45 p.m., and I do recognize it by that particular information, the property receipt number 88–0649 and my initials TCS.

"THE COURT: Number of the exhibit?

"THE WITNESS: I beg your pardon. The number of the exhibit is 45.

"Q. Were you present when the blood was removed from the Defendant?

"A. Yes, I was.

" * * *

"Q. Okay. Now, am I correct in summarizing that you sent this tube of blood to Cellmark?

"A. That is correct.

"Q. State's Exhibit 45?

"A. That is correct."

Blair admits that State's Exhibit 45 was the basis of the DNA tests performed by Cellmark. Furthermore, Cellmark's Timothy Stacey identified State's Exhibit 45 as being the blood sample that he analyzed. Shepard's testimony from personal knowledge was sufficient to identify the blood as being Blair's. Evid.R. 901(B)(1). Despite the fact that blood is a "fungible item," the markings placed on the vial by Shepard, the testimony that it was sent to Cellmark, and the admission that this was indeed the blood tested amount to a proper chain of custody. *State v. Reese* (1978), 56 Ohio App.2d 278, 10 O.O.3d 285, 382 N.E.2d 1193; *State v. Hinders* (Oct. 30, 1989), Montgomery App. No. 10750, unreported, 1989 WL 130796.

Blair's third argument under this assignment of error is that Timothy Stacey was not qualified to testify as an expert witness on the DNA test· results. Contrary to the state's assertion, we find that the objection to Stacey's qualifications was sufficient to preserve this issue for appellate review.[2]

The Supreme Court has held that:

"The qualification of an expert is a matter for determination by the court on the facts, and rulings with respect to such matters will ordinarily not be reversed unless there is a clear showing that the court abused its discretion." *State v. Maupin* (1975), 42 Ohio St.2d 473, 479, 71 O.O.2d 485, 488, 330 N.E.2d 708, 713.

Stacey holds a bachelor of science degree in medical technology. He has worked for Cellmark for over one year as a microbiologist and hybridization supervisor. During this time, he has worked on thirty to forty forensic cases and over one thousand paternity cases involving the same or similar tests that were performed on Blair's blood. Stacey was a member of the team of scientists who tested Blair's blood, and according to his testimony, his duties in this project were "to have total responsibility of forensic cases that came in, from the logging in of the evidence, to the extraction of the DNA, to all the way to the final interpretation of whether it's a match or not, and seeing that that report is passed over to our PH.D.'s for their interpretation and to monitor the final statistical data to make sure that all that is being done, and

---

2. For the rationale behind this holding, see the discussion of the seventh assignment of error, below.

then finally sending the reports to the clients and the evidence back to the submittor."

On this record, it is impossible for us to say that the trial court abused its discretion in allowing Stacey to testify as an expert witness.

Blair contends that Stacey should not have been allowed to testify as an expert because he was less qualified than his supervisors who held Ph.D.s. We disagree. The mere fact that Cellmark had employees who might have been *more* qualified does not mean that Stacey was *un*qualified. Taken to its extreme, Blair's argument would necessitate that in any given field only one person, the world's leading expert, would be competent to testify in court. Obviously, such a result is not envisioned by the Rules of Evidence.

 In his final argument under this assignment of error, Blair argues that the testimony of a second Cellmark expert, Lisa Forman, was inadmissible as hearsay because it was based upon reports prepared by other scientists. Unlike with Stacey, Blair did not object to Forman's testimony either at trial or in voir dire. Therefore, any potential error on this basis was waived by Blair's failure to object. Evid.R. 103(A)(1).

 Moreover, it is impossible to tell from the record whether Forman was testifying from personal knowledge or from hearsay, *i.e.*, the final report from Cellmark which was not introduced into evidence. The bulk of Forman's trial testimony was a general explanation of genetics and the process used by Cellmark. Forman also testified extensively as to her interpretation of several "autorads," or pictures on x-ray film which show the pattern of DNA banding. Since the autorads were previously introduced during Stacey's testimony, Forman was allowed to use them as a basis for her opinion. Evid.R. 703. More problematical is Forman's testimony that Blair's DNA banding pattern occurs in only one out of every 2.6 million Caucasian males. While this conclusion was stated in the final report, it is not clear what was the source of Forman's opinion. Forman's job at Cellmark is to develop and analyze statistical population data bases, such as the 1:2.6 million ratio. Although Forman did not receive the information from this case until the night before she testified, she stated that:

"I reviewed this case when the case was completed and determined whether or not there was a match between the known samples provided by Ms. Buxton and Mr. Blair and the question evidence from the case; and I examined these data and determined whether or not the analyses were appropriate."

It is simply impossible on this record to separate what was based upon her personal knowledge and expertise from what, if anything, was a mere reiteration of the report's conclusions. Thus, even if Blair had not waived this

argument by his utter failure to object to any of this testimony, he still could not prevail due to his failure to demonstrate error.

The sixth assignment of error will be overruled.

Blair asserts in his seventh assignment of error that:

"The trial court erred in admitting the DNA test results in the present case because such testing has not been proven sufficiently reliable to be admitted in a criminal case."

A threshold question presented by the state is whether Blair properly preserved this issue for appellate review. We find that he did.

On August 1, 1989, Blair filed a motion *in limine* requesting that the trial court rule on the admissibility of the preliminary DNA test results. On August 16, 1989, the trial court held that this motion was premature because it had not yet heard from the state's expert witnesses, and, therefore, during trial "the State is directed to notify counsel for the defendant and the court prior to calling any witness to testify to the report so that a hearing may be held away from the jury's presence prior to the court ruling."

After Cellmark completed its final report, Blair filed a second motion *in limine* on September 7, 1989, contesting the admissibility of these results as well. Immediately preceding the commencement of the trial, the court ruled that it would wait until it heard from the Cellmark experts before ruling on this motion.

On the third day of the trial, the jury was removed from the courtroom while the trial judge heard the merits of Blair's motion. The state presented two witnesses from Cellmark, Stacey and Forman, while Dr. Charles Shaffer testified for Blair. At the close of this evidence, the trial court overruled Blair's motion, holding that the DNA evidence was admissible. The jury re-entered the courtroom and heard the testimony of Stacey and Forman. Blair did not object to the introduction of the DNA evidence when it was presented to the jury, thus giving rise to the state's claim of waiver.

The state directs our attention to *State v. Brown* (1988), 38 Ohio St.3d 305, 528 N.E.2d 523, paragraph three of the syllabus, for the proposition that "[a] denial of a motion *in limine* does not preserve error for review. A proper objection must be raised at trial to preserve error." However, *Brown* and the cases cited therein deal only with motions that were heard before trial, not during trial as in the case before us. Indeed, the very words *"in limine"* mean "preliminarily." Black's Law Dictionary (6 Ed.1990) 787. The rationale for the waiver does not apply when the motion is heard during trial because this was a final ruling on admissibility instead of a preliminary ruling subject to revision when the evidence is offered. See Judge Whiteside's exposition on

the nature of liminal motions in *Riverside Methodist Hosp. Assn. v. Guthrie* (1982), 3 Ohio App.3d 308, 310, 3 OBR 355, 357, 444 N.E.2d 1358, 1361. Although still called a "motion *in limine*," by hearing it in midtrial, the proceeding was in effect a voir dire of the expert witnesses. Therefore, the issue of admissibility was preserved for review.

Blair contends that DNA testing has not been proven reliable enough to be admissible in criminal prosecutions. In this regard, Blair seems to argue, under the standard applicable in most states, that results from a new scientific process are only admissible if it has "gained general acceptance in the particular field in which it belongs." *Frye v. United States* (1923), 293 F. 1013, 1014. However, Ohio has specifically rejected the *Frye* test in favor of a "more flexible standard." *State v. Williams* (1983), 4 Ohio St.3d 53, 57, 4 OBR 144, 147, 446 N.E.2d 444, 447.

"The Ohio Rules of Evidence establish adequate preconditions for admissibility of expert testimony [for new scientific processes]. It is within the sound discretion of the state's judiciary, on a case by case basis, to decide whether such testimony is relevant and will assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.* at syllabus.

Thus, our inquiry is limited to whether the trial court abused its discretion in admitting the DNA evidence. We hold that it did not.

The trial court heard extensive testimony from Stacey and Foreman as to the process used in the length polymorphism test, also known as "DNA fingerprinting." DNA is first extracted from forensic samples, such as the semen stains in the instant case. This DNA is then mixed with enzymes which cut the DNA into segments that vary in length. An electric current is then passed through a gel containing the fragments. This spreads the fragments into an array with the shortest fragment being closest to the positive electrode, while the longest fragment is farthest away. Radioactive probes are then introduced into the array. These probes will attach themselves only to certain fragments, called polymorphic DNA segments. An x-ray, called an autorad, is then taken of the array. The radioactive probes show up on the x-ray film as dark bands, thus showing the position and length of polymorphic DNA segments. An identical procedure is then performed on DNA from a known source, which in this case was the blood drawn from Blair. The x-ray films are then compared. Theoretically, no two people should have dark bands of the same length or in the same positions. Therefore, if the x-ray films match, the DNA probably came from the same person. A statistical analysis is then performed to determine the probability of a false match with someone with similar genetic characteristics. In this case, Cellmark determined that Blair's DNA matched the DNA from the semen stain,

and that this particular banding pattern occurs in only one out of every 2.6 million Caucasian males.

Dr. Shaffer, a biology professor at Wittenberg University, testified on Blair's behalf. Shaffer expressed no doubts as to the underlying theories behind "DNA fingerprinting"; however, he did testify that some of the techniques employed by Cellmark were inadequate. Specifically, Shaffer found two flaws: (1) the comparison between the x-ray films should have been made by an objective machine instead of a subjective human eye; and (2) a "mixed lane test" should have been performed since it would have further reduced the chance of an erroneous match. Shaffer testified that he could not form an opinion as to the overall validity of this particular test because the Cellmark report stated only conclusions and not the raw data they were based upon.

Based upon this record, we cannot say that the trial court acted arbitrarily, unreasonably, or capriciously in admitting the DNA test results. Therefore, Blair's argument must fail. *Williams, supra.*

Blair has presented us with voluminous scholarly works that cast grave doubts upon not only the techniques employed by Cellmark and Lifecodes, but also the underlying theories of "DNA fingerprinting." These articles seem to indicate that the general scientific community is quite skeptical of the entire process. Fueling this skepticism is the fact that no validity studies of the test have been made by anyone who was not associated with one of the two companies which market it. Moreover, many of the details of the process are zealously guarded "trade secrets," making independent confirmation impossible.

However, the trial court did not have the benefit of this information. At trial, Blair argued that while DNA testing was a valid forensic tool, the results of *his* test were invalid because the procedure was improperly performed. On appeal, Blair now argues that the test is invalid in and of itself and should, therefore, *never* produce admissible results. It is axiomatic that:

"An appellate court need not consider an error which a party complaining of the trial court's judgment could have called, but did not call, to the trial court's attention at a time when such error could have been avoided or corrected by the trial court." *State v. Williams* (1977), 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph one of the syllabus.

By not presenting the trial court with this argument, Blair has waived it on appeal.

We note that the "flexible standard" of admissibility is not an all-encompassing rule. The Supreme Court emphasized that trial courts could not

determine the admissibility of polygraph results on a case-by-case basis. *State v. Williams* (1983), 4 Ohio St.3d 53, 56, 4 OBR 144, 147, 446 N.E.2d 444, 446, fn. 4. Presumably, this is because the results are so inherently questionable, yet so potentially devastating to the defense, that they cannot be admitted except under very limited circumstances. See *State v. Souel* (1978), 53 Ohio St.2d 123, 7 O.O.3d 207, 372 N.E.2d 1318. There is some indication that "DNA fingerprinting" might be of the same nature. However, it is not the place of this court to expand an exception that has been strictly limited to polygraph tests.

The seventh assignment of error will be overruled.

■ As his eighth assignment of error, Blair asserts that:

"The trial court erred when it admitted, over objection, the testimony that Mr. Blair had a DNA banding pattern that occurs in one in 2.6 million Caucasian males."

Several of Blair's arguments in support of this assignment of error are reiterations of contentions made under the sixth and seventh assignments of error. We reject these arguments on the bases expressed above.

■ Blair also argues that the statistical evidence was an unfair quantification of the state's burden to prove him guilty "beyond a reasonable doubt." We disagree. Statistical evidence is admissible when used to establish the significance of an expert opinion which is based upon scientific analysis. *Owens v. Bell* (1983), 6 Ohio St.3d 46, 6 OBR 65, 451 N.E.2d 241. As explained above, the statistical evaluation was performed to reduce the possibility of a false genetic match. Even Blair's expert witness, Dr. Shaffer, testified that the test results were virtually worthless without an accompanying statistical analysis. Therefore, the statistics were a necessary part of the "DNA fingerprinting," not a quantification of the burden of proof.

It must also be remembered that the test results did not indicate that Blair murdered Buxton. Instead, it indicated that the semen found on the car seat was Blair's. This in turn proves that Blair was in the car on the night of the murder, thus corroborating Pestke's testimony. The statistical evidence, while providing "one piece to the puzzle," was not directly inculpatory and, therefore, cannot be viewed as a numerical probability of Blair's guilt.

The eighth assignment of error will be overruled.

Blair asserts as his ninth assignment of error that:

"The trial court erred when it refused to permit the defense expert to refer to the report of the state's experts and [*sic*] said report was the only basis for the opinion of the state's two (2) experts. Such error violated Mr. Blair's right

as guaranteed by the Fifth, Sixth and Fourteenth Amendments to the United States Constitution."

Blair again hinges his argument on the contention that the Cellmark witnesses, Stacey and Forman, should not have been allowed to testify as to the DNA test results. We rejected this argument in the sixth assignment of error, *supra.*

■ Furthermore, Blair has waived this argument by not proffering the substance of what Dr. Shaffer would had testified if he had been allowed to refer to Cellmark's final report. *State v. Gilmore* (1986), 28 Ohio St.3d 190, 28 OBR 278, 503 N.E.2d 147; Evid.R. 103(A)(2). Shaffer's testimony at the preliminary hearing held on August 9, 1989, was not sufficient to preserve this issue. This hearing was limited to the *preliminary* report, not the final report which is at issue here. The substance of Shaffer's testimony at the hearing was that the preliminary report was insufficient because it lacked certain necessary parts, such as a statistical analysis. As seen above, these defects were cured in the final report. Since we cannot speculate as to what Shaffer's testimony might have been, we must overrule this assignment of error. *Gilmore, supra.*

As his tenth assignment of error, Blair asserts that:

"The trial court erred when it permitted the state of Ohio to call Pat Sullivan as rebuttal witness to testify as to a previous statement made by Shirley Blair."

The defendant's mother, Shirley Blair, testified for her son. She testified that on the morning of the murder, her son came to her home at 5:20 a.m., and that he was "dry." She also testified that she told "pretty much" the same story to Det. Pat Sullivan of the Clark County Sheriff's Department. The state later recalled Det. Sullivan in rebuttal, and he testified that Mrs. Blair had told him her son was "wet" on that morning.

■ The state concedes that there was insufficient foundation for Mrs. Blair's prior inconsistent statement under Evid.R. 613(B), but argues that Blair waived this argument by failing to object to Det. Sullivan's testimony. We agree. Evid.R. 103(A)(1). We also agree with the state that whether Blair was wet or dry shortly after the crime is not dispositive of his guilt or innocence. Therefore, since we cannot say that "the outcome of the trial would clearly have been otherwise" if Det. Sullivan had not testified, Blair's argument cannot prevail. *State v. Underwood* (1983), 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332, syllabus.

■ Blair also argues that he should have been allowed to put his mother on the stand again in surrebuttal. However, since there was no proffer of

Mrs. Blair's testimony, this argument must also fail. *Gilmore, supra;* Evid.R. 103(A)(2).

■■■ In his eleventh assignment of error, Blair contends that:

"The trial court erred when it instructed the jury that it could not consider a lesser included offense until after the jury had found the defendant not guilty of the greater offense."

The jury instruction in question is as follows:

"You'll have two forms of verdict or two verdicts in there, one for each count. The verdict for Count I reads as follows: 'We, the jury, find the'—it has two sentences in it. The first sentence, 'We, the jury, find Jeffrey J. Blair'—there's a blank space for inserting 'guilty' or 'not guilty' of murder as charged in Count I of the indictment. If your finding is guilty according to these instructions, you will insert the word 'guilty' and in that blank space and ignore the second sentence which also has a blank.

"If your finding is not guilty as to murder, you will put 'not guilty' in that blank and proceed to determine whether or not the State has established the lesser crime of involuntary manslaughter beyond a reasonable doubt, and you will, of course, then insert in there either 'guilty' or 'not guilty' but you do not proceed to the second sentence if you find the Defendant guilty of murder.

"* * *

"It will require all 12 of your members to reach a verdict and each of you must sign the verdict."

Blair argues that this amounted to an instruction that the jury must first unanimously have found him not guilty of murder before it could have considered the lesser included offense of involuntary manslaughter, in violation of the Supreme Court's holding in *State v. Thomas* (1988), 40 Ohio St.3d 213, 533 N.E.2d 286. We do not agree.

■■■ We note that Blair's failure to object to this instruction has yet again waived any potential error. *State v. Underwood, supra;* Crim.R. 30(A). Even if Blair had not waived the argument, however, it still would not prevail. In upholding an almost identical instruction, we held that *Thomas* stands for the proposition that a jury may not be prevented from considering offenses in any order that it sees fit. *State v. Henderson* (Sept. 13, 1989), Clark App. No. 2464, unreported, 1989 WL 106201. We hold that the instruction in question did not expressly require the jury to unanimously acquit Blair of murder before it was allowed to even consider the charge of involuntary manslaughter. Therefore, the final assignment of error must be overruled. *Henderson, supra.*

All of Blair's assignments of error having been overruled, the judgment of the trial court will be affirmed.

*Judgment affirmed.*

BROGAN and GRADY, JJ., concur.