[Cite as *State v. Blair*, 2018-Ohio-4041.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**CLARK COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 2017-CA-75 |
| | : | |
| v. | : | Trial Court Case No. 88-CR-369 |
| | : | |
| JEFFREY J. BLAIR | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 5th day of October, 2018.

. . . . . . . . . . .

ANDREW P. PICKERING, Atty. Reg. No. 0068770, Clark County Prosecutor's Office,
Appellate Division, 50 E. Columbia Street, Suite 449, Springfield, Ohio 45501
        Attorney for Plaintiff-Appellee

JEFFREY J. BLAIR, #214560, P.O. Box 740, London, Ohio 43140
        Defendant-Appellant, Pro Se

. . . . . . . . . . . . .

HALL, J.

{¶ 1} Defendant-Appellant, Jeffrey[1] Blair, appeals pro se from the judgment of the Clark County Common Pleas Court denying his postconviction application for DNA testing. By statute, a trial court is precluded from accepting an application for DNA testing unless the offender can show that a new test would produce an exclusion result or that such a result would have been outcome determinative at trial. Blair has not and cannot show this, so the trial court properly rejected his application.

## I. Background

{¶ 2} In 1988, Bridget Buxton's body was found in the Mad River. The following year, a jury found Blair guilty of murdering Buxton and abusing her corpse. Blair was sentenced to fifteen years to life in prison for the murder and to a consecutive three to five years for abuse of a corpse. He appealed his convictions, and this Court affirmed. *State v. Blair*, 70 Ohio App.3d 774, 592 N.E.2d 854 (2d Dist.1990).

{¶ 3} Buxton was the ex-girlfriend of Blair's brother. Testimony from Mike Pestke established that Blair and Buxton were together when the two of them left Bill McConnell's house in Buxton's car to get cocaine on the night that she was murdered. Pestke testified that Blair told him the next morning that Buxton had been murdered and asked him (Pestke) to provide an alibi. According to Pestke, Blair told him that he stood by and watched as a man who called himself Buxton's boyfriend bashed Buxton's head against the pavement until she died. Blair admitted to Pestke that he helped the man throw her body into the river.

{¶ 4} The coroner determined that the cause of death was strangulation and a skull

---

[1] Throughout the docket Blair's first name most often is spelled "Jeffrey," but sometimes is spelled "Jeffery." His filings spell it "Jeffrey," and the case is docketed as "Jeffrey," so we use that iteration.

fracture. A vaginal smear found semen, but there was no sign of forced intercourse. Buxton's car was found nearby with its doors and seats stained with blood and semen. Cellmark Diagnostics, Inc. performed DNA testing on the cloth from the car seat and on samples of Blair's blood, hair, and saliva. The tests showed that the DNA from the seat had come from Blair and Buxton. As we said in our opinion on direct appeal, "Cellmark determined that Blair's DNA matched the DNA from the semen stain, and that this particular banding pattern occurs in only one out of every 2.6 million Caucasian males." *Id.* at 793-794.

{¶ 5} Approximately 27 years after his conviction, in October 2016, Blair filed an application for postconviction DNA testing in the trial court. On August 9, 2017, the trial court rejected the application. Blair appeals from this rejection.

## II. Analysis

{¶ 6} The sole assignment of error states:

Mr. Blair was deprived of his right to have new DNA testing done pursuant to R.C. 2953.71 when prior errors in forensic DNA analysis through the Cellmark Lab ha[ve] been recognized. (October 21, 2016 Application).

{¶ 7} Blair argues that, since his 1989 trial there have been advances in DNA testing that make results more accurate. He also asserts that testing done by Cellmark should be regarded as suspect because Cellmark has a history of tampering with test results. Blair cites information that he found on the Internet about two California cases, one in 1988 and the other in 1989, in which Cellmark made false matches. For these reasons, argues Blair, a new DNA test should be performed in his case on the sperm found on the car seat. We fail to see how what happened in two California cases is

relevant to this case. Blair presented no evidentiary material to indicate or infer that Cellmark did anything suspect with the DNA test results in this case. Regardless, Blair's application for DNA testing does not satisfy the statutory requirements.

**{¶ 8}** Postconviction DNA testing is governed by R.C. 2953.71 to 2953.81. Any eligible offender may submit an application for DNA testing to the appropriate court of common pleas. R.C. 2953.72(A). If "a prior definitive DNA test has been conducted regarding the same biological evidence that the offender seeks to have tested, the court shall reject the offender's application." R.C. 2953.74(A). In this case, there is no dispute that Blair is an eligible offender and that a prior DNA test was conducted on the sperm found on the car seat. Thus, the court was required to reject Blair's application if it determined that the prior DNA test was definitive. *See State v. Noling*, 136 Ohio St.3d 163, 2013-Ohio-1764, 992 N.E.2d 1095, ¶ 34 (holding that the "threshold criterion [in R.C. 2953.74(A)] requires a court to reject the application if a prior definitive DNA test has been conducted").

**{¶ 9}** The trial court here did not clearly identify in its written decision the statutory basis that it relied on to reject Blair's application. The court rejected the application saying that, though the prior DNA test was less sensitive than a new test would be, the results of the prior test sufficiently established that the semen on the seat came from Blair. Given that the parties' arguments focused on whether the prior DNA test was a "definitive DNA test," it appears that the court rejected the application because the prior test was definitive, although it could be that the court concluded a new test would not produce an "exclusion result."

**{¶ 10}** A trial court's determination whether a prior DNA test is a "definitive DNA

test" is discretionary. *See* R.C. 2953.72(A)(8) (recognizing "that the court of common pleas has the sole discretion * * * to determine whether * * * an eligible offender's application for DNA testing satisfies the acceptance criteria" in R.C. 2953.74, which include the "definitive DNA test" determination); *Noling* at ¶ 34 (calling the "definitive DNA test" determination in R.C. 2953.74(A) the "threshold criterion"). But a court's discretion is constrained by law. The law applicable to this matter, R.C. 2953.74(A), states that a court must reject an application for DNA testing if a prior "definitive DNA test" has been conducted on the same biological evidence that the offender seeks to have tested. "Definitive DNA test" is pertinently defined as

> a DNA test that clearly establishes that biological material[2] from the perpetrator of the crime was recovered from the crime scene and also clearly establishes whether or not the biological material is that of the eligible offender. A prior DNA test is not definitive if the eligible offender proves by a preponderance of the evidence that because of advances in DNA technology there is a possibility of discovering new biological material from the perpetrator that the prior DNA test may have failed to discover.

R.C. 2953.71(U). In other words, for there to be a "definitive DNA test," the prior DNA test must clearly establish that the biological material was from the perpetrator and that the biological material did or did not come from the offender, or the offender must show by a preponderance of the evidence that advances in DNA will possibly reveal new DNA from the perpetrator.

---

[2] "Biological material" is defined as "any product of a human body containing DNA." R.C. 2953.71(B).

{¶ 11} In our opinion, the use of the phrase "perpetrator of the crime" in the statutory definition awkwardly conflicts with the apparent purpose of the statute. It appears that the statute is intended not to allow a repeat DNA test when the defendant already has had a positive DNA test that connects that offender to the crime scene. Almost never, except perhaps in some sexual assault cases, will a positive DNA test identify the "perpetrator" of the offense, because discovery of an offender's DNA at the scene confirms that person's presence at or connection to the event, but most often does not identify activity or the intent of the actor. For specific instance, in this case a positive DNA result places Blair at the crime scene and confirms involvement in sexual activity, but it does not and cannot independently demonstrate whether he was the one who bashed Buxton's head or threw her into the river. The positive DNA test does not identify the perpetrator.   Likewise, the last sentence of that section of the statute is flawed, to the detriment of an offender, because even if an offender is excluded, almost never will newer DNA technology lead to identity of the "perpetrator" of the offense; it can only lead to the identity of someone else who might have been present. Again, DNA evidence alone will most often not confirm or deny activity or intention. Specifically here, even if new technology could possibly identify someone else's DNA from the car seat material, it would tend to show that person was in Buxton's vehicle at some time, but it would not reveal who bashed her head or who threw her body in the river.

{¶ 12} Nonetheless, here the trial court appears to have considered only the second part of the statutory definition - that the prior DNA testing established that DNA from the car seat came from the offender. The court's decision can be read as finding that the prior test of the DNA found on the car seat "clearly establishes" that it contained Blair's

DNA, but the decision seems not to address the first part or the third part of the definition - whether the prior test established that the DNA came from the victim's killer or whether Blair demonstrated by a preponderance of the evidence that new testing might reveal the killer.

{¶ 13} Given the literal wording of the statute, the record in this case does not support a finding that the prior DNA testing "clearly establishes" that the DNA on the car seat came from the killer. As we noted in our direct-appeal opinion, "[i]t must also be remembered that the [DNA] test results did not indicate that Blair murdered Buxton. Instead, it indicated that the semen found on the car seat was Blair's. This in turn proves that Blair was in the car on the night of the murder, thus corroborating Pestke's testimony." *Blair*, 70 Ohio App.3d at 794, 592 N.E.2d 854. Because the literal statutory definition of "definitive DNA test" is not satisfied in this case, the trial court could not base its rejection of Blair's application for DNA testing solely on the "definitive DNA test" criterion.

{¶ 14} Alternatively, however, we do not believe that the law allowed the trial court to accept the application in any event. The statutory scheme also precludes a court from accepting an application for DNA testing unless the offender can show that "DNA exclusion when analyzed in the context of and upon consideration of all available admissible evidence related to the subject offender's case * * * would have been outcome determinative at the trial stage in that case." R.C. 2953.74(B)(2). "DNA exclusion" refers to "a result of DNA testing that scientifically precludes or forecloses the subject offender as a contributor of biological material." R.C. 2953.71(G). "Outcome determinative" means "that had the results of DNA testing of the subject offender been presented at the trial * * *, and had those results been analyzed in the context of and upon consideration of all

available admissible evidence related to the offender's case * * *, there is a strong probability that no reasonable factfinder would have found the offender guilty of that offense." R.C. 2953.71(L).

{¶ 15} The only way additional testing could even potentially be outcome determinative is if it were to positively exclude Blair as a source of any of the DNA at the scene; as we said in the direct appeal, the "DNA analysis of the semen stains might have worked to the benefit, instead of the detriment, of the defendant." *Blair* at 784.

{¶ 16} Here, with a positive test of Blair's DNA, the best he could hope for from a subsequent more sensitive test of the same biological material would be a result showing that the car seat DNA was a mixture from Blair and someone else, but that would not be a "DNA exclusion" and further would not have been "outcome determinative." Either one of those conclusions would have prevented the trial court from accepting Blair's application. R.C. 2953.74(B)(2). Ultimately, even if it were theoretically possible for a new test to exclude Blair entirely, it cannot be said that there is a strong probability that no reasonable factfinder would have found Blair guilty. As we said in our direct-appeal opinion, the DNA test results at trial were merely corroborative: "[T]he [DNA] test results did not indicate that Blair murdered Buxton. Instead, it indicated that the semen found on the car seat was Blair's. This in turn proves that Blair was in the car on the night of the murder, thus corroborating Pestke's testimony." *Id.* at 794. Mike Pestke testified that Blair and Buxton were together when they left McConnell's house in Buxton's car to get cocaine the night that she was murdered. Blair admitted to Pestke that Blair was present on the bridge when Buxton was killed and thrown over the guardrail. Pestke further testified that Blair asked him to be his (Blair's) alibi. Later, Blair told Petske that he had returned to the

crime scene and had disposed of the evidence. Blair's story about an unidentified boyfriend bashing Buxton's head on the pavement failed to explain Buxton's blood on the doors and seats of the car, and failed to explain the coroner's finding that she was also strangled. Under all these circumstances, we conclude that a new DNA test on the same material would not result in an exclusion and would not be outcome determinative.

{¶ 17} Although Blair criticizes Cellmark, he presents no evidentiary material that its results on his case were false or that any recent advances in DNA science demonstrate that the procedures used by Cellmark were unreliable and that such new advances would prove that his DNA was not present.

{¶ 18} The trial court here properly rejected Blair's postconviction application for DNA testing, because Blair did not and could not show that a new test would produce an exclusion result or that it would have been outcome-determinative.

### III. Conclusion

{¶ 19} "[A] reviewing court is not authorized to reverse a correct judgment merely because erroneous reasons were assigned as a basis thereof." *State ex rel. Carter v. Schotten,* 70 Ohio St.3d 89, 92, 637 N.E.2d 306 (1994). Accordingly, the sole assignment of error is overruled, and the trial court's judgment is affirmed.

. . . . . . . . . . . . .

DONOVAN, J. and FROELICH, J., concur.

Copies sent to:

Andrew P. Pickering
Jeffrey J. Blair
Hon. Douglas M. Rastatter